# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

MARY BEATRICE BYRD,                    :

     Plaintiff,                    :

vs.                    :         CA 09-781-C

MICHAEL J. ASTRUE
Commissioner of Social Security,                    :

     Defendant.                    :


## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Docs. 15 & 16 ("In accordance with provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, including . . . order the entry of a final judgment, and conduct all post-judgment proceedings.")) Upon consideration of the administrative record (Doc. 19), Plaintiff's brief (Doc. 17), the Commissioner's brief (Doc. 20), and the arguments made by the parties at the July 14, 2010 hearing, it is determined that the Commissioner's decision denying Plaintiff benefits should be

reversed and remanded for further proceedings not inconsistent with this decision.

**RELEVANT FACTUAL BACKGROUND**

Plaintiff primarily alleges disability from diabetes mellitus, diabetic neuropathy, diabetic retinopathy, migraine headaches with scotomata, hypertension, irritable bowel syndrome with history of colon polyps, osteoarthritis with chronic joint pain, carpal tunnel syndrome, and depression. (R. 150-87, 196-318; Doc. 17, pp. 2-3.) The Administrative Law Judge (ALJ) made the following relevant findings:

> **2. The claimant has the following severe medically[-]determinable impairments: a history of insulin[-]dependent diabetes mellitus with secondary mild diabetic peripheral neuropathy in the lower extremities and very early diabetic retinopathy affecting binocular vision (20 C.F.R. § 404.1520(c)).**

.  .  .

> . . . [T]he claimant reports many severe symptoms of a debilitating nature that are either incongruent with established physical disorders or unsubstantiated by objectively[-]demonstrable medical evidence. Nevertheless, the preponderance of the evidence does establish that the claimant possesses a combination of physical impairments imposing some significant work-related functional limitations on her. For instance, her ability to engage in moderate to heavy, strenuous exertion is likely compromised by her possession of longstanding insulin[-]dependent diabetes. Her capacity for prolonged to continuous amounts of standing and walking is also likely compromised significantly by apparent mild diabetic peripheral neuropathy in the lower extremities. I acknowledge the existence of the same severe, functionally[-]limiting impairments based primarily on reports maintained by several treating medical sources and the April 2007 consultative neurological examination findings of Dr. Yager (Exhibit 14F). The claimant's diagnostic assessments are predicated on a variety of clinical test results and physical examination findings. Despite a one-time diagnosis of "lumbar radiculopathy" by Dr. Thomas C. McGee in July 2007, I see no corresponding objective medical findings to substantiate such impairments. In fact, the claimant has not even presented complaints of a lumbar spinal impairment like a disc

2

herniation, degenerative lumbar spondylosis, or lumbar spinal stenosis. The same can be said for Dr. McGee's references to the diabetic peripheral neuropathy in the claimant's upper extremities into her hands and degenerative osteoarthritis in her knees and hips. X-rays of the hips he ordered in July 2007 were considered "normal" for age; and his own physical examination findings belie the presence of such medical problems, i.e. the hips, knees, and ankles looking "good" and free of "active synovitis" or warmth, redness, and swelling. Dr. McGee did not refer to one shred of objective medical evidence verifying the existence of peripheral neuropathy in the upper extremities (Exhibits 16F and 19F). When compared to Dr. Yager's more qualified neurological examination findings, I see no reason to qualify any such diagnosis as valid. The only credence I give to Dr. Yager's reports surround his references to mild gait unsteadiness by the claimant, which is a natural consequence of peripheral neuropathy affecting the lower extremities, and his diagnosis of very mild degenerative arthritic changes in the hands, which are corroborated by Dr. Yager's consultative report . . . .

The record suggests that other than one episode of diabetic ketoacidosis in January 2006 requiring hospitalization, the claimant's underlying diabetes has been fairly well controlled by prescribed insulin. Indeed, when placed on an intravenous drip of insulin during this "uncomplicated" hospitalization, the claimant's blood glucose was brought down to a controlled level of 113 by discharge (Exhibit 1F). Her hospitalization in July 2007 for treatment of a fainting or syncopal spell was never actually attributed to uncontrolled blood glucose or any other diabetic complication (Exhibit 15F). The claimant's daily use of an insulin pump over the last 2 years appears quite successful in controlling her blood glucose level. I do not minimize the effects of the claimant's apparent binocular loss of visual acuity, but I do not attribute it all to chronic poor diabetic control. When evaluated in May 2006 by Dr. Claude M. Warren, III, an ophthalmologist, the claimant had best corrected visual acuity of 20/20 bilaterally. She was considered free of any "diabetic retinopathy [in] either eye" (Exhibit 9F). Dr. Warren believed the claimant's early cataracts were more of a visual hindrance. A consultative examination by another ophthalmologist, Dr. Edward C. Baranano, in June 2006 only identified signs of very "early" background diabetic retinopathy. The claimant's prognosis was considered "good", as was her ocular muscle function and peripheral vision and visual efficiency. Although her bilateral best corrected visual acuity was 20/30 on the right and 20/60 on the left, Dr. Baranano only placed restrictions on the claimant regarding driving an automobile, and that only to wear her prescribed glasses.

In summary, I do not consider the vast majority of the claimant's reported impairments even severe in the context of triggering objectively reliable functional

limitations over 12 continuous months since January 2006. The only severe impairments are listed above. I have also considered the functional capacity estimate provided by Dr. T. Gregory McKelvey in March 2007; but I have assigned his opinion little weight in this case (Exhibit 12F). Dr. McKelvey appears to have simply enumerated the claimant's own subjective complaints and treated them at face value as often "virtually incapacitating" to her. He has mostly treated the claimant for potential cardiovascular complications of her diabetes, but has identified none significant. In fact, his treatment records are devoid of any documented compelling abnormalities (See Exhibits 13F). At the same time, I have assigned much greater weight to the consultative neurological examination findings and functional capacity assessment completed by Dr. Yager.

The claimant's allegations of a pervasive inability to attend to and concentrate on any mental task undertaken for longer [than] a few minutes and her naked assertions about getting "stressed out" in front of a computer monitor are simply wholly subjective and unsubstantiated and cannot be quantified as specifically[-]functioning limiting impairments.

   3.   **The claimant does not possess singular or combined physical impairments that have met or equaled one or more of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). The claimant's diagnosed diabetic peripheral neuropathies in the lower extremities specifically do not satisfy any "Listing" criteria under Sections 9.08A.**

While the claimant has been diagnosed with insulin[-]dependent diabetes and resultant diabetic neuropathies in both lower legs and feet, she has clearly sustained no corresponding significant and persistent disorganization of motor function in her lower extremities resulting in the types of sustained gait disturbances contemplated in companion "Listing" section 11.00C. To the contrary, the claimant can and still does ambulate[] without assistance; and she freely admits performing some household chores and grocery shopping, as well as driving an automobile. These activities are hardly indicative of someone totally debilitated and unable to stay on her feet by profound diabetic neuropathies. Instead, the claimant appears to have early diabetic neuropathies that might preclude her from prolonged to continuous period[s] of standing and walking associated with all but a sedentary range of work activity.

   4.   **After careful consideration of the entire record, I find that the claimant has possessed the residual functional capacity since January 2006 to perform a full range of at least sedentary exertional level work (20 C.F.R. §§**

**404.1567(b) and 416.967(b)). I do not find her visual restrictions significant enough to preclude her performance of substantially all sedentary jobs.**

In making this finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 404.1529 and SSRs 96-4p and 96-7p. I also considered opinion evidence in accordance with the requirements of 20 C.F.R. 404.1527 and SSRs 96-2p, 96-5p[,] and 96-6p.

Dr. Yager has provided the best qualified medical and only true functional assessment of the claimant in the record (Exhibit 14F). His findings are wholly consistent with the claimant engaging in a sedentary or even greater range of physical exertion on a regular and sustained basis. Indeed, he reported finding no sensory, motor, or muscle strength deficits in the arms, shoulders, or hands that might interfere with her capacity to perform a full range of sedentary work, including repetitive use of a computer. The claimant appears quite able to grasp with her hands, write, and button and unbutton her clothes without difficulty. Nevertheless, she does have a demented mild gait disturbance secondary to diabetic peripheral neuropathy. Yet, she still requires no assistive device for support when trying to walk or stand. She can also bend or stoop at the waist. As a consequence of her gait abnormalities, it is more than reasonable to assume the claimant could not stand or walk longer than about 2 hours out of a customary 8-hour workday. Consistent with Dr. Yager's functional assessment, the claimant could occasionally lift and carry up to 30 pounds, repetitively reach and manipulate her fingers and hands, and at least occasionally balance, kneel, crouch, or squat. Thus, the claimant quite clearly retains the capacity for occasional stooping, meaning she is able to engage in a full range of sedentary work activities.

I have not neglected to fully consider all of the other evidence in this case in reaching the above residual functional capacity finding, including evidence favorable to the claimant. However, I find it far less persuasive than Dr. Yager's consultative report. I am not downplaying the treating medical references to recurrent migraine headaches by the claimant; however, simple prescribed medication appears able to attenuate most associated symptoms. The record is clear to me that outside of some infrequent to occasional breakthrough headaches, the claimant's medication controls the condition without lasting functional consequences, i.e. even in terms of being able to sustain concentration and focus while working on a computer monitor like in her old job.

**5.   The claimant is still capable of performing her past relevant work**

as a computer help desk technician for a large chemical manufacturing and refining company. This work did not require the claimant's performance of any work-related activities outside of the residual functional capacity referenced above, especially standing and walking in excess of 2 hours per typical 8 hour workday and occasional lifting and carrying up to 30 pounds (20 C.F.R. §§ 404.1565 and 416.965). The description of such employment by a vocational expert witness at the October 25, 2007 hearing (as it is customarily performed in the national economy) is compatible with the functional physical demands of a sedentary range of work activity. In comparing the claimant's residual functional capacity with the physical demands of such work, I find that the claimant is quite able to perform such work as it is customarily performed in the national economy. I also note that the claimant's own description of such work is equally consistent with a sedentary range of work activity (Exhibit 1E).

6. The claimant has not been under a "disability," as defined in the Social Security Act, from January 6, 2006[,] through the date of this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

(R. 19-23.) The Appeals Council denied Plaintiff's request for review, and so the hearing decision became the final decision of the Commissioner of Social Security. (R. 1.)

## DISCUSSION

In all Social Security cases, the claimant bears the burden of proving that she is unable to perform her previous work. *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. *Id.* Once the claimant meets this burden, as here, it becomes the Commissioner's burden to prove that the claimant is capable, given her age,

education and work history, of engaging in another kind of substantial gainful employment which exists in the national economy.  *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).  Although at the fourth step, "the claimant bears the burden of demonstrating the inability to return to her past relevant work, the Commissioner of Social Security has an obligation to develop a full and fair record."  *Shnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987) (citations omitted).

The task for the Court is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that she retains the residual functional capacity (RFC) to perform the sedentary range of work activity and could perform her past relevant work, is supported by substantial evidence.  Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence."  *Davison v. Astrue*, 370 Fed. Appx. 995, 996 (11th Cir. 2010) (per curiam) (citing *Dyer v. Bernhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)).  And finally, "[e]ven if the evidence preponderates against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence."  *Id.* (citing *Crawford v. Comm'r of Social Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)).

Social Security Ruling 82-61 recognizes three possible tests for determining whether or not a claimant retains the capacity to perform her past relevant work. They are as follows:

1. Whether the claimant retains the capacity to perform a past relevant job based on a broad generic, occupational classification of that job, *e.g.*, "delivery job," "packaging job," etc.

2. Whether the claimant retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it.

3. Whether the claimant retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers throughout the national economy.

Under § 404.1520(e) of the Commissioner's regulations, a claimant will be found to be "not disabled" when it is determined that she retains the residual functional capacity to perform the actual functional demands and job duties of a particular past relevant job or the functional demands and job duties of the occupation as generally required by employers throughout the national economy. SSR 82-61.

In this case, the ALJ relied upon test three above to determine that the claimant can perform her past relevant work as a customer help desk technician when he explained:

[T]he claimant has possessed the residual functional capacity since January 2006 to perform a full range of at least sedentary exertional level work[, and] her visual restrictions [are not] significant enough to preclude her performance of substantially all sedentary jobs.

.      .      .

> [Moreover, t]he claimant is still capable of performing her past relevant work as a computer help desk technician for a large chemical manufacturing and refining company [because t]his work did not require the claimant's performance of any work-related activities outside of the residual functional capacity referenced above . . . . The description of such employment by a vocational expert witness at the October 25, 2007 hearing (as it is customarily performed in the national economy) is compatible with the functional physical demands of a sedentary range of work activity. In comparing the claimant's residual functional capacity with the physical demands of such work, I find that the claimant is quite able to perform such work as it is customarily performed in the national economy. I also note that the claimant's own description of such work is equally consistent with a sedentary range of work activity.

(R. 22-23.) Section 404.1520(e) of the Commissioner's regulations requires a review and consideration of a plaintiff's residual functional capacity and the physical and mental demands of the past work before a determination can be made that the plaintiff can perform her past relevant work. Social Security Ruling 82-62 provides that evaluation under § 404.1520(e) "requires careful consideration of the interaction of the limiting effects of the person's impairment(s) and the physical and mental demands of . . . her PRW [past relevant work] to determine whether the individual can still do that work." *See also Lucas v. Sullivan*, 918 F.2d 1567, 1574 n.3 (11th Cir. 1990) (to support a conclusion that a claimant "is able to return to her past work, the ALJ must consider all the duties of that work and evaluate her ability to perform them in spite of her impairments").

> The RFC to meet the physical and mental demands of jobs a claimant has performed in the past (either the specific job a claimant performed or the same kind of work as it is customarily performed throughout the economy) is generally a sufficient basis for a finding of "not disabled."

> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.
>
> Sufficient documentation will be obtained to support the decision. Any case requiring consideration of PRW will contain enough information on past work to permit a decision as to the individual's ability to return to such past work (or to do other work). Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations. Detailed information about strength, endurance, manipulative ability, mental demands and other job requirements must be obtained as appropriate. This information will be derived from a detailed description of the work obtained from the claimant, employer, or other informed source. Information concerning job titles, dates work was performed, rate of compensation, tools and machines used, knowledge required, the extent of supervision and independent judgment required, and a description of tasks and responsibilities will permit a judgment as to the skill level and the current relevance of the individual's work experience.

SSR 82-62. In finding that a claimant has the capacity to perform a past relevant job, the decision of the Commissioner must contain among the findings, a finding of fact as to the claimant's residual functional capacity, a finding of fact as to the physical and mental demands of the past job/occupation, and a finding of fact that the claimant's residual functional capacity would permit a return to the past job or occupation. *Id.*

In this case, Plaintiff contends that the following errors were made: (1) the ALJ improperly evaluated the evidence from Plaintiff's treating physician, Dr. McKelvey; (2) the ALJ improperly evaluated Plaintiff's credibility; and (3) the ALJ improperly

evaluated Plaintiff's residual functional capacity.   (Doc. 17, pp. 10-11.)

The ALJ found that Plaintiff retains the RFC to perform full range of at least sedentary exertional level work.   In doing so, however, the ALJ rejected an RFC assessment from Plaintiff's treating physician, Dr. McKelvey.

Dr. McKelvey treated Plaintiff for almost eighteen months—from February 9, 2006 through August 2, 2007—and his notes from that time period reflect treatment and management of a host of ailments: diabetes mellitus, diabetic peripheral neuropathy, background diabetic retinopathy, hypertension, hyperlipidemia/hypercholesterolemia, constipation, reflux disease, headaches, depression, weight gain, palpitations, renal dysfunction, cataracts, and a thyroid nodule.   (*See* Doc. 17, pp. 4-5 (citing R. 236-259 & 293-302).)   Dr. McKelvey also noted Plaintiff's difficulties with medications and with regulating her blood sugar, and referred Plaintiff to several specialists.   (*Id.*)   On March 15, 2007, he both examined Plaintiff (R. 238, handwritten office notes from that day) and completed a Clinical Assessment of Symptoms ("CAS") (R. 231-235).   The completed CAS lists diagnosis of: DM type 2 on insulin pump, diabetic neuropathy, hyperlipidemia, migraine headaches, and CTS (R. 231-235); and identified symptoms to include: fatigue, general malaise, extremity pain and numbness, difficulty walking, loss of manual dexterity, episodic vision blurriness, dizziness/loss of balance, migraine headaches, insulin shock/coma, hyper/hypoglycemic attacks, sensitivity to light, heat or cold, and difficulty with concentration (R. 231).   In her brief, Plaintiff further described Dr. McKelvey's completed CAS as follows:

Symptoms, including pain, were noted to be present to such an extent as to be distracting to the adequate performance of daily activities or work, and to be virtually incapacitating. Physical activity, such as walking, standing, sitting, bending, stooping, moving extremities, etc., would greatly increase the severity and degree of symptoms to such an extent as to cause the inability to engage in work or work-related tasks on a regular and sustained basis over the course of an 8-hour day. Medication side effects could be expected to be severe and to limit effectiveness due to distraction, inattention, drowsiness, etc. (R. 232.) She was totally restricted from exposure to unprotected heights, to moving machinery, and to marked changes in temperature and humidity. She was moderately restricted in driving. (R. 233.) She did not require a cane or assistive device for ambulation. (R. 234.) Dr. McKelvey documented she would sometimes require unscheduled breaks during an 8-hour work day for 15 minutes every hour for 15-30 minutes at a time. He indicated she needed to lie down or recline daily for an hour. With prolonged sitting, she needed to elevate the legs waist high, for 4-6 hours daily. Dr. McKelvey indicated that Ms. Byrd had extreme limitations in the ability to deal with work stress. He did not believe she was a malingerer. (R. 233.) He expected her to have "good days" and "bad days" due to her impairments, and estimated that she would be absent from work due to her impairments or treatment more than 3 days a month. Drug/alcohol abuse was not a contributing factor material to the functional restrictions and limitations in the form. (R. 234.) Dr. McKelvey documented that her impairments had lasted or could be expected to last at least 12 months (R. 233), and had been present since February, 2006, when she first started treatment for neuropathy. (R. 234.)

(Doc. 17, pp. 8-9.)

"The regulations establish a hierarchy of medical opinions," *Hill v. Barnhart*, No. 1:06-CV-0133-BBM-RGV, 2007 WL 438161, at *13 (N.D. Ga. Jan. 16, 2007), and the "opinion of a treating source 'must be given substantial or considerable weight unless "good cause" is shown to the contrary.'" *Id.* (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)) (citations and footnote omitted). Where, as here, the ALJ has effectively rejected the opinion of a treating physician, the Court must consider if the ALJ

did so for good cause:

> In evaluating medical opinions, the ALJ considers many factors including the examining relationship, the treatment relationship, whether an opinion is amply supported, whether an opinion is consistent with the record, and a doctor's specialization. [20 C.F.R.] § 404.1527(d). . . . "Good cause" exists to discredit a physician's testimony when it is contrary to or unsupported by the evidence of record, or it is inconsistent with the physician's own medical records. *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). Accordingly, the ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). When an ALJ articulates specific reasons for failing to accord controlling weight to the opinion of a treating or examining physician and those reasons are supported by substantial evidence, there is no reversible error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

*Davison*, 370 Fed. Appx. at 996-97; *see also Nichols v. Astrue*, Civil Action No. 09-0291-WS-N, 2010 WL 2042615, at *5-*6 (S.D. Ala. May 21, 2010) (same). Finally, "[w]hile statements from treating physicians regarding the level of work a claimant can perform are important, they are not determinative[,] because the ALJ has the ultimate responsibility to assess a claimant's residual functional capacity." *Carson v. Comm'r of Soc. Sec. Admin.*, 300 Fed. Appx. 741, 743 (11th Cir. 2008) (per curiam) (citations omitted).

The relevant inquiry for this Court, then, is whether the ALJ made a sufficient demonstration of "good cause" when rejecting Dr. McKelvey's medical opinion(s), or whether he (1) articulated specific reasons for rejecting the opinion from the treating source and (2) showed that those reasons are supported by substantial evidence. Turning to the ALJ's decision, excerpted above, it is clear that both of these tasks have not been

accomplished in this case.

The ALJ's reasons for discrediting Dr. McKelvey were threefold. The ALJ found (1) that "Dr. McKelvey appears to have simply enumerated the claimant's own subjective complaints and accepted them at face value as often 'virtually incapacitating' to her"; (2) Dr. McKelvey "has mostly treated the claimant for potential cardiovascular complications of her diabetes, but has identified none significant"; and (3) Dr. McKelvey's "treatment records are devoid of any documented compelling abnormalities." (Tr., p. 21.)

The ALJ's conclusion that Dr. McKelvey's opinion in the CAS were "simply [Plaintiff's] own subjective complaints[, which Dr. McKelvey] accepted [ ] at face value" has no basis in the record. Plaintiff contends that the only basis for the ALJ's conclusion that Dr. McKelvey did little more than adopt Plaintiff's complaints as his medical opinion was when, during the hearing (Tr., pp. 44-47), the ALJ recited some of the questions and answers from the CAS and asked Plaintiff if she had told Dr. McKelvey that she had "all these problems," (Doc. 17, pp. 13-14). While Plaintiff's brief characterizes the ALJ's conclusion as "conjecture" (*id.*, p. 13), the Commissioner counters that the ALJ "reasonably concluded that Dr. McKelvey's opinion was based primarily on Plaintiff's subjective complaints." (Doc. 20, p. 9.)

The undersigned agrees with Plaintiff; from my independent review of the record, I find nothing to support the notion that Dr. McKelvey based his opinion on Plaintiff's

subjective complaints alone.[1]  First, nowhere on the face of the CAS does Dr. McKelvey indicate that his assessment of Plaintiff is based on her responses to his questions.  *Cf. McDonald v. Barnhart*, 358 F. Supp. 2d 1034, 1038-39 (D. Kan. 2005) (finding that ALJ properly disregarded a treating physician's opinion where "plaintiff acknowledged at the hearing that she took the RFC form to [the physician], who completed the form in her presence based on her subjective responses to the questions").

Second, on the same day the CAS was completed—March 15, 2007—Dr. McKelvey's handwritten office notes (R. 238) indicate that he examined Plaintiff.  *See Coleman v. Astrue*, No. 07-1217 MLB, 2008 WL 1735391, at *6-*7 (D. Kan. Apr. 14, 2008) (improper for ALJ to speculate as to basis for physician's opinion, especially where physician recently examined Plaintiff); *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (noting that the treating physician's opinion may "reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time"); *see, e.g., Victory v. Barnhart*, 121 Fed. Appx. 819, 824 (10th Cir. 2005) ("[Treating physician's] April 3, 2001 statement might well have been based on his recent first-hand examination and observation of claimant during this examination, performed less than two weeks earlier, rather than on claimant's subjective complaints, as the ALJ speculated."); *cf. McDonald v. Barnhart*, 358 F. Supp. 2d at 1039 ("As the ALJ correctly

---

[1]     The Court is not saying that none of Dr. McKelvey's opinion is based on Plaintiff's perceptions; there, of course, is nothing wrong with that.  *See Sharpe v. Astrue*, No. 5:07cv74/RS-MD, 2008 WL 1805436, at *5-*8 (N.D. Fla. Apr. 15, 2008) (noting that "[i]n many cases . . . a treating physician's opinion is based in large part on the patient's subjective

noted, however, the form was completed based not on results from any medical examination conducted by Dr. Butler-Taylor or even from Dr. Butler-Taylor's own opinion but on the subjective responses given to Dr. Butler-Taylor by plaintiff.").

Moreover, Plaintiff's counsel wrote to the ALJ on November 6, 2007—after the October 25, 2007 hearing at which the ALJ questioned Plaintiff about the CAS—to explain that he had been "unable to get a letter from Dr. McKelvey," but that Dr. McKelvey's "nurse told [his] staff that it was his opinion [ ] expressed [in] the [March 15, 2007 CAS]," and that while Dr. McKelvey "did not feel he should have to explain this," Plaintiff's counsel asked the ALJ to "consider requesting that [Dr. McKelvey] send [to the ALJ] a letter explaining this." (R. 149.) From the record, it does not appear that the ALJ attempted to solicit such a letter from Dr. McKelvey. If the ALJ had doubts as to whether the opinion expressed in the CAS was Dr. McKelvey's, he should have contacted Dr. McKelvey. *See* 42 U.S.C. § 423(d)(5)(B) ("In making any determination the Commissioner of Social Security shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination."); *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.").

Third, an ALJ may rightly conclude that the opinion of a treating physician is not

_____

complaints of pain").

credible because he determines that the treating physician's patient is not credible, as appears to be the case, at least in part, here.  *See Majkut v. Comm'r of Social Sec.*, No. 09-12823, 2010 WL 3394474, at *4 (11th Cir. Aug. 30, 2010) (per curiam) ("The ALJ found that Dr. Levine's opinions were based solely on Majkut's subjective complaints, and ***she was not credible in this respect***." (emphasis added)); *Long v. Shalala*, 902 F. Supp. 1544, 1547 (M.D. Fla. 1995) (***cited by the ALJ***, R. 17) ("Because the Administrative Law Judge determined that the Petitioner was not credible, he deduced that the opinions of her treating physicians were not credible.  ***The Administrative Law Judge properly took her credibility into account before evaluating the validity of her treating physician opinions***." (emphasis added)) (citing 20 C.F.R. § 404.1527(d)(6) (mandating the consideration of other factors before deciding how much weight to accord a medical opinion)); *Soroka v. Astrue*, No. 8:08-cv-1423-T-TBM, 2009 WL 2424563, at *5 (M.D. Fla. Aug. 5, 2009) (finding good cause for ALJ's rejection of treating physician's opinion for a host of reasons, including that "he relied 'quite heavily' on the subjective complaints of the Plaintiff ***despite good reason to question the reliability of the subjective evidence***" (emphasis added)).   However, as the cases cited above demonstrate, implicit in evaluating a treating physician's opinion based in part on a plaintiff's subjective opinion is the requirement that the ALJ also assess the credibility of the plaintiff.   As when an ALJ rejects pain testimony, here too must the ALJ explain his rationale for finding a plaintiff not credible.   As one court explained, in the context of the *Hand* pain analysis:

17

> Although the Eleventh Circuit does not require an explicit finding as to a claimant's credibility, the implication must be obvious to the reviewing court. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer*, 395 F.3d at 1210 (11th Cir. 2005) (internal quotations and citations omitted).

*Sharpe v. Astrue*, No. 5:07cv74/RS-MD, 2008 WL 1805436, at *6 (N.D. Fla. Apr. 15, 2008). The record does not reflect that the ALJ conducted such an analysis here.

The ALJ mischaracterizes Dr. McKelvey's relationship with Plaintiff. This mischaracterization potentially downplays Dr. McKelvey's role as Plaintiff's primary treating physician. According to the ALJ, Dr. McKelvey was mostly treating Plaintiff for potential cardiovascular complications of her diabetes. But, as Plaintiff points out, Dr. McKelvey saw Plaintiff ten times over an eighteen-month period (*see* R. 236-259 & 293-302), and treated Plaintiff directly for her diabetes and the neuropathy emanating from the diabetes, as well as the numerous symptoms and signs listed on the CAS form (*see* R. 231). Even the Commissioner concedes that the ALJ mischaracterized the extent of Dr. McKelvey's involvement, but argues that this mistake is harmless error. (Doc. 9, p. 9.) Because, when asked to consider the limitations set out by Dr. McKelvey in the CAS, an independent vocational expert opined that he did not "believe [Plaintiff] could perform her past relevant work or any other work" (R. 54)—which is directly at odds with the ALJ's conclusion in this case—any mischaracterization of Dr. McKelvey's involvement with Plaintiff's case cannot be harmless error. *See* Davison, 370 Fed. Appx.

at 996-97 (citing 20 C.F.R. § 404.1527(d) and noting that "[i]n evaluating medical opinions, the ALJ [should] consider[ ] many factors including the examining relationship [and] the treatment relationship"); *cf. Dewey v. Astrue*, 509 F.3d 447, 449 (8th Cir. 2007) (in light of the record, court reversed and remanded because "we cannot say that the ALJ would inevitably have reached the same result" had mistake not occurred).

The ALJ further found that Dr. McKelvey's treating records were "devoid of any documented compelling abnormalities." (R. 21.) But, in her brief, Plaintiff contends that Dr. McKelvey's findings were "supported by his treatment notes and those of his partners, as well as specialists who informed Dr. McKelvey of their own conclusions," consistent with his role as Plaintiff's treating physician. (Doc. 17, p. 12.) The undersigned's independent review of the record indicates that Plaintiff is correct. (*See* R. 236-259 & 293-302 (Dr. McKelvey's records); R. 202 (clinical notes from Dr. Roca, indicating that a copy was sent to Dr. McKelvey); R. 269-283 (Springhill Medical Center reports listing Dr. McKelvey as admitting and attending physician); R. 285 & 308 (Dr. McGee reports, listing Plaintiff as patient of Dr. McKelvey); R. 287-288 (Dr. McGee report, indicating that a copy was sent to Dr. McKelvey); R. 297 (eye exam report sent to Dr. McKelvey); R. 304-306 (records from Dr. Warren listing Dr. McKelvey as Plaintiff's primary physician).) *See Driver v. Astrue*, Civil Action File No. 1:07-CV-3014-AJB, 2009 WL 631221, at *22 (N.D. Ga. Mar. 9, 2009) (in addition to referring his patient to specialists, physicians "own treatment notes indicate that Plaintiff suffered from a number of medical conditions and that he monitored and for which he prescribed a variety of

medications").

The ALJ's treatment of Dr. Yager's report should also be addressed. While the ALJ assigns "little weight" to the opinion of Dr. McKelvey, he rejects—and substitutes his own opinion in place of—a portion of Dr. Yager's opinion, to which he assigned "much greater weight." (R. 20-21.) As part of his report, Dr. Yager opined that Plaintiff could stand for six hours out of an eight-hour day. (R. 265.) Without citing to a separate, contrary medical opinion, the ALJ found that "[a]s a consequence of her gait abnormalities, it is more than reasonable to assume the claimant could not stand or walk longer than 2 hours out of a customary 8-hour workday." (R. 22.) The ALJ may not substitute his own "medical" opinion for that of a physician. *See Hill v. Barnhart*, No. 1:06-CV-0133-BBM-RGV, 2007 WL 438161, at *12 (N.D. Ga. Jan. 16, 2007) ("An ALJ may, of course, engage in whatever idle speculations regarding the legitimacy of the claims that come before [him] in [his] private or personal capacity; however, as a hearing officer, [the ALJ] may not arbitrarily substitute [his] own hunch or intuition for the diagnosis of a medical professional.") (quoting *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992) (Johnson, J., concurring)); *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) ("Our review of the record, however, convinces us that the ALJ erred in applying the relevant legal standards to the facts of this case. In particular, the ALJ improperly supplanted the opinions of Morales's treating and examining physicians with his personal observation and speculation.").

"Ordinarily, when an ALJ improperly or inadequately rejects a treating physician's

opinion, the physician's opinion is accepted as true as a matter of law." *Driver*, 2009

WL 631221, at *23 (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)).

However, here, the ALJ did not ignore Dr. McKelvey's opinion, but rather gave it little

weight. Instead, as in *Driver*, 2009 WL 631221, at *23, and in *Harris v. Astrue*, 546 F.

Supp. 2d 1267, 1282 (N.D. Fla. 2008), the ALJ in this case substantially complied with

the regulations, but his reasons for discrediting the opinion of Dr. McKelvey were

improper. "Therefore, remand is the appropriate remedy, and upon remand, the opinions

of Dr. [McKelvey] should be reconsidered. If the opinions are again discredited, the

reasons for doing so should be proper and supported by substantial evidence in the

record." *Id.*

Because this issue is dispositive of this appeal, the Court need not consider

Plaintiff's remaining arguments. *Robinson v. Massanari*, 176 F. Supp. 2d 1278, 1280 &

n.2 (S.D. Ala. 2001); *cf. Pendley v. Heckler*, 767 F.2d 1561, 1563 (11th Cir. 1985)

("Because the 'misuse of the expert's testimony alone warrants reversal,' we do not

consider the appellant's other claims.").

## CONCLUSION

It is **ORDERED** that the decision of the Commissioner of Social Security denying

Plaintiff benefits be reversed and remanded pursuant to sentence four of 42 U.S.C. §

405(g), *see Melkonyan v. Sullivan*, 501 U.S. 89 (1991), for further proceedings not

inconsistent with this decision. The remand pursuant to sentence four of § 405(g) makes

Plaintiff a prevailing party for purposes of the Equal Access to Justice Act, 28 U.S.C. §

2412, *Shalala v. Schaefer*, 509 U.S. 292 (1993), and terminates this Court's jurisdiction over this matter.

**DONE** this the 21st day of September, 2010.


s/ WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**